# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Raytheon Missile Systems Company | ) | ASBCA No. 59258 |
| | ) | |
| Under Contract No. N00019-04-C-0569 | ) | |

APPEARANCES FOR THE APPELLANT:    Robert M. Moore, Esq.
Robert D. Windus, Esq.
Jason C. Constantine, Esq.
  Moore & Lee, LLP
  McLean, VA

Sharon S. Jones, Esq.
  Counsel

APPEARANCES FOR THE GOVERNMENT:    Ronald J. Borro, Esq.
  Navy Chief Trial Attorney
James T. DeLanoy, Esq.
  Senior Trial Attorney
Taylor Ferrell, Esq.
  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

This is the quantum phase of *Raytheon Missile Systems Company*, ASBCA No. 57594, 13 BCA ¶ 35,264, *recon. denied*, 13 BCA ¶ 35,321, wherein the Board sustained Raytheon's appeal in part. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. Raytheon is entitled to $2,390,784 plus CDA interest.

*Objections*

The parties elected to submit the quantum case under Board Rule 11 on the record. Both parties filed objections to various affidavits/declarations and documents. The Navy objects to affidavits from Mr. Blume and Mr. Torres arguing that the affidavits violate the best evidence rule. With respect to Mr. Blume the Navy seems to fault his testimony because he did not observe the fueling of each missile (Bd. corr. file, gov't obj. dtd. 21 August 2014 at 1). With respect to Mr. Torres the Navy complains that Raytheon is improperly presenting "expert testimony under the guise of lay testimony" (*id.* at 5). We have considered these and the other arguments made by the Navy and reject them.

Raytheon presents a list of objections to Ms. Caccivio's and Mr. Grams' declarations. We considered each basis presented for the objections and deny the objections.

Board Rule 11 specifically provides that "[a]ffidavits, declarations, depositions, admissions, answers to interrogatories, and stipulations may be employed in addition to the Rule 4 file if moved and accepted into evidence...to be made part of the record." By agreeing to a Board Rule 11 submission, each party is entitled to submit affidavits/declarations in place of the live testimony that would have been available had the parties elected a hearing. In a Board Rule 11 submission each party has the opportunity to deal with aspects of these substitutes for live testimony by taking depositions and submitting transcripts or through rebutting affidavits/declarations or documents. The parties' objections to each other's affidavits/declarations are denied.

The Navy objects to "annotated" DESC invoices for JP-10 at Rule 4, tab 17,[1] and appellant's supplemental Rule 4, tabs 166 and 169.[2] We will deal with the Navy's objection to appellant's supplemental Rule 4, tabs 166 and 169 later in this decision. Raytheon objects to an extensive variety of documents. We considered Raytheon's objections and deny them.

## DISCUSSION

*The Entitlement Decision*

Familiarity with our entitlement decision is assumed. Generally, the case involved the government's $11.00/gallon increase in JP-10 cruise missile jet fuel to finance building a storage facility (Defense Fuel Support Point or DFSP), stocking it with JP-10, and covering losses on other commodities. We concluded that Raytheon had not assumed the risk of an increase in fuel cost for financing the DFSP and stocking it. In our entitlement decision we sustained Raytheon's appeal as it related to that part of the $11.00 increased price that was allocated to building the DFSP and purchasing fuel to stock it. We denied the appeal as it related to that part of the price increase used to offset losses on other Defense Energy Support Center (DESC) commodities. *Raytheon*, 13 BCA ¶ 35,264 at 173,117-18. Therefore, it is Raytheon's burden to prove its damages by proving how many gallons of fuel it purchased at the $25.00 rate and loaded into Contract No. N00019-04-C-0569 (Contract 0569) missiles. It is also Raytheon's burden to prove how much of the $11.00 increase was allocable to the causes we sustained in the entitlement appeal.

---

[1] This document was in the entitlement Rule 4 file and is already in the record.
[2] Rule 4, tabs 163 to 170, were not part of the evidence in the entitlement phase.

*DFSP and JP-10 Stock*

From our entitlement decision we know that DESC contracted with Dixie to build the DFSP for $1,199,940 and that the DFSP was completed in FY09. We also know that the DFSP would have a capacity of 130,000 gallons and that DESC purchased at least 100,000 gallons of JP-10 to stock the DFSP. *Raytheon*, 13 BCA ¶ 35,264 at 173,109-10, finding 23. We also know that surplus money resulting from sales of the $25.00 JP-10 covered losses from the previous year on JP-10 and other aerospace energy commodities. *Raytheon*, 13 BCA ¶ 35,264 at 173,110, finding 25.

Raytheon supplements what we know from our entitlement decision with evidence from a DESC budget preparation sheet that indicates DESC's reserve inventory was projected to increase from 162 gallons in FY09 to 129,818 in FY11 or a purchase of 129,656 gallons of JP-10 (app. supp. R4, tab 134). During this time the price DESC paid Dixie for JP-10 ranged from $14.99 to $15.90[3] (R4, tab 54 at 4). Using the $14.99 price, the 129,656 reserve inventory would cost DESC $1,943,543. We need not be more precise because the total amount for building the DESC and paying for the JP-10 to stock it ($1,199,940 + $1,943,543 = $3,143,483) is well above the $2,390,784 damage to Raytheon we calculate below as a result of the $11.00 price increase to $25.00/gallon.

*Order on Proof of Costs*

The Board issued an Order on Proof of Costs on 11 April 2014. Raytheon filed its Statement of Costs (SOC) on 23 May 2014. The Navy responded to the SOC on 23 June 2014. Raytheon replied to the Navy's response on 3 July 2014. The parties then chose to file Board Rule 11 briefs and reply briefs that supplemented the facts with additional Rule 4 documents and arguments.

According to Raytheon, the Navy did not audit its SOC (app. br. at 2), and we find no evidence of an audit of the SOC in the record. While we draw no inference from this fact, the result is that the Navy's defense to Raytheon's SOC data is largely rhetorical.

*Total Cost Claim*

The Navy characterizes Raytheon's quantum analysis as a "total cost" claim and structures much of its quantum brief's argument around the elements of proof required to sustain a total cost claim (gov't br. at 27-36). We agree with Raytheon, this is not a total cost claim. *See, e.g., Raytheon Co. v. White* 305 F.3d 1354, 1365 (Fed. Cir. 2002) ("Under the total cost method, the measure of damages is the difference between the actual cost of the contract and the contractor's bid."); *WRB Corp. v. United States*, 183 Ct. Cl. 409, 426 (1968) (total cost claim is difference between actual and estimated

---

[3] During this time period Raytheon was paying DESC $25.00/gallon.

expenses). Rather, Raytheon's approach to quantum identifies the number of gallons of fuel priced at $25.00 that it loaded into Contract 0569 missiles and, with certain other adjustments, simply calculates quantum based on the $11.00 difference between $14.00/gallon Raytheon bid and the $25.00/gallon charged. This approach is a direct quantification of the damage caused by the Navy's breach.

*The Amount of Fuel Per Missile*

It is undisputed that the missiles are delivered to the Navy fully fueled. The parties could not agree on the number of gallons of fuel in each missile. Raytheon contends that each missile holds approximately 141 gallons of fuel, 13 of which are provided by the engine manufacturer and not Raytheon (app. br. at 6-7). Therefore, Raytheon contends that it loads approximately 128 gallons of fuel in each missile (app. br. at 6).

The Navy objects to the last 13 pages of the documents at appellant's supplemental Rule 4, tab 166, that purport to list the weight of fuel in missiles by tail number. We agree with the Navy as to these pages because they do not appear to be attached or related to the email string in the first 6 pages of tab 166. The last 13 pages will not be considered by the Board. However, the emails in the first 6 pages appear regular on their face and contain relevant information that we rely upon. Appellant's supplemental Rule 4, tab 166, includes a copy of Drawing 1492526, sheet 14, which is an excerpt from a test document. The document indicates the following:

> Usable Fuel Volume:
> Verify calculated quantity of useable fuel loaded 990 lbs
> minimum for PAV and 920 lbs minimum for RSS
> equipped missile.

(App. supp. R4, tab 166 at 2) In a 23 August 2010 letter to the Defense Contract Audit Agency, Mr. Blume referred to drawing 1492526, sheet 14, and explained that a gallon of JP-10 weighs approximately 7.72 pounds and that 990 pounds of fuel equated to approximately 128 gallons (app. supp. R4, tab 167). The Navy contests the 128 gallons but its own calculations using specific gravity result in a mean of 126.3036 gallons of fuel in each missile (gov't br. at 14, ¶ 54). We do not consider this a significant variance and we adopt 128 gallons as the number of gallons in each missile provided by Raytheon for the computation of quantum.

*The Navy's Quantum Arguments*

In its initial Board Rule 11 brief the Navy spent most of its argument on the elements of a total cost claim (gov't br. at 26-35). Since we do not consider a total cost claim, this argument is unpersuasive. However, the Navy also appears to argue that since the DFSP was not built until FY09 that the additional amounts paid by

Raytheon when the price was $25.00 in FY07 and FY08 must have gone to offset losses and could not have been used to pay for the DFSP or the JP-10 to stock it (gov't. br. at 36-37; gov't reply br. at 16). The Navy argues, "Raytheon has obviously failed to meet its burden on demonstrating any amount of $25 JP-10 sold to it for the contract at issue was used to finance the DFSP" (gov't br. at 37). The record is replete with evidence that the $25.00 price was designed to finance the DFSP and pay for the JP-10 to stock it.[4] The Navy's argument is unpersuasive.

The Navy also argues that it was Raytheon's fault that it incurred the additional costs associated with the increase to $25.00/gallon because of "delays or inefficiencies" (gov't reply br. at 22-24). The theory seems to be that Raytheon should have delivered more missiles with the cheaper fuel before the price increased to $25.00 and therefore it should not recover for those missiles. There is no evidence that the Navy took any adverse action against Raytheon for these alleged inefficiencies or delays. Additionally, some of this occurred before Raytheon learned of the Navy's coming price increase in July 2006. After Raytheon first learned of the price increase it made a variety of attempts to mitigate the damage to no avail. *Raytheon*, 13 BCA ¶ 35,264 at 173,110-11, findings 26, 28-31. The Navy's delays or inefficiencies argument is unpersuasive.

*Quantum Calculations*

Raytheon relies on three things to calculate its quantum amount: (1) 128 gallons per missile; (2) invoices at $25/gallon (R4, tab 17; app. supp. R4, tab 122); and (3) a list of missiles and DD 250 acceptance dates (app. supp. R4, tab 169). We accepted the 128 gallon figure above. We accept the invoices as evidence of the total number of gallons of fuel purchased at the $25.00 rate. We discuss the list of missiles and DD 250 acceptance dates below. Raytheon must now establish how many of those gallons of $25.00 fuel were loaded into Contract 0569 missiles.

Raytheon relies on the affidavit testimony of Mr. Thomas Blume to identify invoices associated with the gallons of $25.00 fuel loaded into Contract 0569 missiles. Mr. Blume testified as follows:

> In preparing Raytheon's Certified Claim and the Revised/Certified Claim, I reviewed, in detail, every gallon of JP-10 fuel that was delivered to Raytheon and where those gallons were utilized. I reviewed each Raytheon invoice from the Defense Energy Support Center ("DESC") through December 31, 2009 to determine the number of gallons of JP-10 Raytheon purchased at $25/gallon instead of $14/gallon under the FRP Contract.

---

[4] *See* entitlement decision, Raytheon 13 BCA ¶ 35,264, findings 21-32.

I annotated the DESC invoices to denote the particular Tomahawk contract that was using the fuel in each invoice. I then compared these invoices to Raytheon's canceled checks and screenshots from Raytheon's accounting system to determine the total impact of the Government's decision to increase the price of JP-10 during Raytheon's performance of the FRP Contract. I included copies of the annotated invoices, canceled checks, and screenshots with Raytheon's Revised/Certified Claim. These items were part of the record in the entitlement proceedings (Rule 4(a) Tab 17) and were attached to Raytheon's Statement of Costs.

(Blume aff. at 4, ¶ 13) Mr. Blume also included projected fuel costs and gave a credit for fuel purchased for less than $14.00/gallon (*id.*).

Mr. Blume relied on the listing at appellant's supplemental Rule 4, tab 169, to document the total number of missiles delivered under Contract 0569 (Blume aff. at 4). The Navy objects to this document (Bd. corr. file, gov't obj. dtd. 21 August 2014 at 6). The document at appellant's supplemental Rule 4, tab 169, is a tabular listing of 1,762 missiles, by tail number, delivered between 1 October 2006 and 29 September 2010 (FY07 to FY10). While Mr. Blume could have elaborated more on the origins of this document, we conclude that his sworn testimony is sufficient for us to consider it. This is particularly true in view of the fact there is no evidence that the Navy made any attempt to audit this listing. We fail to understand the basis for the Navy's objection and reject its argument that the "DD 250 date does not represent the date of missile fueling" (Bd. corr. file, gov't obj. dtd. 21 August 2014 at 7). It is obvious that the DD 250 date accepting each fully loaded missile will not be the date of fueling. We deny the Navy's objection to appellant's supplemental Rule 4, tab 169.

Using the listing at appellant's supplemental Rule 4, tab 169, Mr. Blume determined that Raytheon delivered 1,762 missiles between FY07 and FY10 (Blume aff. at 4). Mr. Blume testified:

Raytheon delivered 1,762 Tomahawk missiles to the Government between FY07-FY10 when the price of JP-10 was $25/gallon. *See* Rule 4(b) Tab 169. After reviewing all of Raytheon's invoices from DESC for the purchase of JP-10 and determining the number of gallons of JP-10 purchased at $25/gallon, I determined that Raytheon fueled 1,749 missiles under the FRP Contract using 223,879 gallons of JP-10 purchased at $25/gallon. Notably, Raytheon actually purchased 303,875 gallons of JP-10 at

6

> $25/gallon between FY07-FY10, but only 223,879 gallons
> were for missiles under the FRP Contract.

(Blume aff. at 4-5, ¶ 15) Mr. Blume does not elaborate on how he made his determination that 1,749 missiles were delivered under Contract 0569 with $25.00 fuel. However, it is obvious that Mr. Blume relied upon the following calculation for total gallons: 128 gallons/missile x 1,749 missiles = 223,879 gallons. It is the 1,749 missiles that we question.

We cannot square Mr. Blume's 1,749 missiles with the records he relied upon. Without his explanation we are left to sort the number out as best we can. There is a 13 missile difference between 1,762 and 1,749. That means that, according to Mr. Blume, the first missile loaded with $25.00 fuel was the fourteenth missile that was accepted by DD 250 dated 3 November 2006 (app. supp. R4, tab 169 at 1). We do not know how much time elapsed between the loading of the fuel and signing of the DD 250 but we know that the fuel was loaded before the DD 250 was signed because the missile was tendered for acceptance fully loaded with fuel. The first purchase of $25.00 fuel is shown on invoice number P-611-078 dated 29 November 2006 (R4, tab 17 at 16). We do not know when that fuel was delivered to Raytheon. We conclude, however, absent any explanation from Mr. Blume, that the $25.00 fuel, invoiced on 29 November 2006, likely was not loaded into the fourteenth missile accepted weeks earlier on 3 November 2006. Therefore we cannot accept Mr. Blume's 1,749 missiles as a basis for calculating quantum. The only firm dates we have to work with are the fuel invoice dates and the missile acceptance, DD 250, dates. The first $25.00 fuel invoice is dated 29 November 2006. The first missile accepted after that date is number 19 accepted on 1 December 2006, only two days after the invoice (app. supp. R4, tab 169 at 1). Our problem is that we do not know when the first of the $25.00 fuel was loaded into the first missile. Given the record we have, there is no precise way to determine which missile number was the first to be loaded with $25.00 fuel. Therefore, we select one month, the month of December 2006, as the period of time to account for the uncertainty associated with the only firm dates we have to rely on. We find it is reasonable to conclude that missiles delivered in January 2007 and thereafter were loaded with $25.00 fuel. If it was an earlier date, Raytheon failed to prove that. The first missile accepted in January 2007 was number 65 accepted on 4 January 2007 (*id.*). Therefore, a reasonable approximation is 1,698 (1,762 minus 64) as the number of Contract 0569 missiles loaded with $25.00 fuel. We calculate the number of gallons in those missiles that Raytheon loaded as 128 x 1,698 = 217,344. Therefore the value of the fuel loaded into the missiles is $11 x 217,344 = $2,390,784.[5] It is Raytheon's burden to reduce this number to account for losses from other commodities, the portion of the entitlement decision that denied Raytheon's appeal.

---

[5] Having found for Raytheon in this regard, we need not address its various other arguments in its initial quantum brief. (app. br. at 15-24).

*Losses from Other Commodities*

In its Rule 11 quantum brief Raytheon argues that it "specifically requested that the Government produce documents indicating how much, if any, of the increased profits from JP-10 sales was used to offset losses on other commodities, Rule 4(b) Tab 165" and that the "Government never produced any such documentation" (app. br. at 22). The document at Rule 4, tab 165 is a subpoena issued by the Board to the Government with a list of documents requested by Raytheon. While the document requests do not include a specific request for "losses on other commodities," the requests are broad enough to require production of this information. In its reply brief, the Navy quotes hearing testimony (on entitlement) by Ms. Murphy, DESC Director, where she agreed that after the price increase to $25.00 the increase offset losses from other commodities (gov't reply br. at 16). The Navy argues:

> Raytheon suggests (AB 22) that it received no documents about DESC losses. That is refuted by the budget preparation sheets showing FY 2006 JP-10 losses that had to be recovered in the next two fiscal years and Rule 4(b), Tab 61, on which Raytheon relies and cites. Raytheon also received other DESC documents that it chose whether or not to add to the record. Those added include: Rule 4(a) Tabs 82, 83, 85, 88; Rule 4(b) Tabs 45, 104, 134. In short, DESC produced everything that it had in its custody. Those portions that Raytheon chose to use out of that collection of documents represents the record evidence in the case as to DESC losses.

(Gov't reply br. at 17) Nowhere in its reply brief or anywhere else does the Navy identify where in the documents it produced is the evidence of losses attributable only to commodities other than JP-10.

What we confront is Raytheon with the burden of proof to establish how much it should reduce its recovery for losses from other commodities stating that it did not receive documents that identify losses for other commodities. The Navy responds saying "yes we did provide the information." In its reply brief the Navy identified eight Rule 4 tabs (see quote in previous paragraph) containing documents it contends provide Raytheon the evidence necessary to calculate the amount to be deducted. We reviewed these documents and saw nothing that obviously identified the dollar amounts of losses from other commodities that would enable Raytheon or the Board to make the calculation. Therefore, we conclude that Raytheon's evidence on this point is sufficient to carry its burden of persuasion that there is no reduction in its recovery to account for losses on other commodities.

8

*Material Burden, G&A and Profit*

Raytheon makes several arguments in support of its request for markup. It argues that it included markup on the $14.00 JP-10 it included in its price of the missiles sold to the Navy. It states that if it had known it would have to pay $25.00 for JP-10 it would have included markup on the $25.00. (App. br. at 27) This fundamentally misses the point that nothing in this transaction was "sold to the Navy." The fuel was sold to Raytheon. The $11.00 increase did not include Raytheon's markup and the refund of the $11.00 should not include markup. To do so would refund more to Raytheon than was taken by the Navy. This would be an unjustified windfall to Raytheon.

The cases cited by Raytheon all stand for the proposition that changes that increase the cost of performance are entitled to markup. We agree with that as a general proposition. However, this is not the case. We decide that the Navy had no right to impose the increase on Raytheon in the first place and we refund the $11.00 cost of the increase to Raytheon. There is no change that increases the cost of performance justifying applying burden to the refund.

CONCLUSION

Raytheon is entitled to $2,390,784 plus CDA interest from the date of receipt of the certified claim.

Dated: 3 September 2015

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

9

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59258, Appeal of Raytheon Missile Systems Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
