ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                          )
                                                     )
Pontchartrain Partners, LLC                          )        ASBCA No. 63615
                                                     )
Under Contract No. W912HY-19-C-0016                  )

APPEARANCE FOR THE APPELLANT:            James R. Washington, III, Esq.
                                           Counsel

APPEARANCES FOR THE GOVERNMENT:          Michael P. Goodman, Esq.
                                           Engineer Chief Trial Attorney
                                         Erin Zetterstrom, Esq.
                                         Clark Bartee, Esq.
                                           Engineer Trial Attorneys
                                           U.S. Army Engineer District, Galveston

OPINION BY ADMINISTRATIVE JUDGE WITWER
ON RESPONDENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

        This appeal arises from a U.S. Army Corps of Engineers (Corps) construction
project in the Corpus Christi Ship Channel.  Appellant, Pontchartrain Partners, LLC,
seeks an equitable adjustment of $4,112,765.73 and a 240-day time extension for alleged
design flaws and resulting changes related to Placement Area No. 10.  This decision
addresses Pontchartrain's claims involving erosion it encountered on the south side of the
placement area and the Corps' motion for partial summary judgment.  The Corps argues
that these claims are barred by release or accord and satisfaction, and alternatively
contends that summary judgment is warranted on Pontchartrain's differing site conditions
and commercial impracticability theories.  For the reasons set forth below, we grant
summary judgment in favor of the Corps on the commercial impracticability claim and
deny the remainder of the Corps' motion.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

*Contract Award*

        The following facts are undisputed.[1]  The Corps' Galveston District awarded
Contract No. W912HY-19-C-0016 to Pontchartrain in September 2019, and issued the

_____

[1] Both parties have submitted a statement of undisputed material facts.  While appellant
        submitted a detailed response to the Corps' statement, the Corps has not responded
        to appellant's submission.  Under Board Rule 7(c)(2), the Board may accept as

notice to proceed in November 2019 (GSUMF ¶ 1; app. resp. to GSUMF ¶ 1; R4, tabs 51A, 50).[2]  The contract involved work at Placement Area No. 10 in the Corpus Christi Ship Channel, including raising the containment dike, constructing an interior berm around the placement area, installing shore protection along the south side of the placement area, and constructing a new drop outlet structure (GSUMF ¶ 1; app. resp. to GSUMF ¶ 1).

*Proposal to Address Excessive Erosion*

In April 2020, Pontchartrain submitted Request for Information (RFI) 0005, alerting the Corps to excessive erosion on the south side of the placement area (GSUMF ¶ 3; app. resp. to GSUMF ¶ 3; R4, tab 41A).  In response, the Corps issued a request for proposal (RFP) in July 2020, suggesting a 16-foot shift of the containment dike and interior berm to address the erosion (GSUMF ¶ 4; app. resp. to GSUMF ¶ 4; R4, tab 38).  Pontchartrain submitted a proposal that same month, requesting $1,053,219.03 and 76 additional days (GSUMF ¶ 5; app. resp. to GSUMF ¶ 5; R4, tabs 37A-B).  It also advised the Corps that the estimate was based on existing surveys and could increase if additional erosion occurred during any delay in issuing a contract modification (app. opp'n at 11 (citing R4, tab 2B at R4F000063)).

In early August 2020, having received no response from the Corps, Pontchartrain submitted a Letter of Notice requesting direction (app. opp'n at 11 (citing R4, tab 2B at R4F000076)).  It later provided additional surveys denoting further erosion, along with overlays on the proposed Corps design shift (app. opp'n at 11 (citing R4, tab 2B at R4F000077-87)).

The work to address the erosion was ultimately added to the contract in two phases through two bilateral modifications.  On August 24, 2020, the parties executed bilateral Modification P00001, which added contract line item number (CLIN) 0012 for the first phase of the additional work, specifically realignment of the containment dike and interior berm—work to be performed on the *inland* side of the placement area (GSUMF ¶ 6; app. resp. to GSUMF ¶ 6; gov't reply at 3; ASUMF ¶ 1(citing Cook aff. ¶ 3); R4, tab 31 at R4F000485, 487).  On December 7, 2020, the parties executed bilateral Modification P00002, which increased CLIN 0012 to implement the second phase of the additional work, specifically the deletion of the exterior shoreline berm and changes to the erosion protection design—work to be performed on the *shoreline* side of the

---

true a fact properly proposed and supported by one party unless the other party properly responds and establishes that it is in dispute.  *Korte-Fusco JV*, ASBCA No. 59767, 15-1 BCA ¶ 36,158 at 176,454 n.1.

[2] "GSUMF" refers to the government's Statement of Undisputed Material Facts.  "ASUMF" refers to appellant's similar statement.

placement area (GSUMF ¶ 9; app. resp. to GSUMF ¶ 9; ASUMF ¶ 1 (citing Cook aff. ¶ 3); R4, tabs 26A-B).  We discuss both modifications in further detail below.

*Modification P00001*

Modification P00001 addressed work on the inland side of the placement area. It established a not-to-exceed amount of $500,000 and granted 30 additional days, stating in pertinent part:

> This will be a one of two part modification.  Part one will include interior shift of the alignment for the containment dike and interior berm prevention to account for excessive erosion on the south side of [Placement Area 10].  This modification is solely for the realignment of containment dike and interior berm as described in revised drawings MOD A00001 Drawing.  The shoreline berm and erosion control quantities and design will be addressed upon the second part of this modification.  30 days will be added to the contract to account for additional work needed for site preparation as a result of the alignment shift.

(GSUMF ¶ 6; app. resp. to GSUMF ¶ 6; R4, tab 31 at R4F000485, 487)  Modification P00001 did not contain any purported release language.

*Modification P00002*

In September 2020, the Corps issued a second RFP for the next phase of the work—this time addressing the shoreline side of the placement area (GSUMF ¶ 7; app. resp. to GSUMF ¶ 7; R4, tab 29A at R4F000461).  The RFP specifically requested a proposal to delete the original shoreline berm from the contract and adjust the quantities of geotextile, blanket stone, and rip rap due to the 16-foot shift of the containment dike and interior berm (R4, tab 29A at R4F000461; app. opp'n at 11-12).  The RFP informed Pontchartrain:

> In accordance with the Contract Clause, "Changes", the Government is seeking a bilateral modification to address excessive erosion of the shoreline between STA 64+00 and 95+53.70.  In part one of two modification, the interior alignment of aforementioned was shifted 16 feet to the interior design template area. This second part of modification is being undertaken to address the shoreline erosion identified in RFI 0005 with changes to CLIN0004,

3

CLIN0005, CLIN0006 and CLIN0011.  This will be the
second part of Modification P00001 of this contract.

(R4, tab 29A at R4F000461)

Pontchartrain submitted an initial proposal in September 2020 and, after
negotiations, a revised proposal in November 2020 requesting $909,332.04 and
64 additional days (GSUMF ¶ 8; app. resp. to GSUMF ¶ 8; R4, tab 2B at R4F000095-
104).  In that proposal, Pontchartrain noted that it was operating under several unknowns
due to the lack of geotechnical information and borings, and that it anticipated continued
erosion and settlement as the dike was constructed (app. opp'n at 12 (citing R4, tab 2A
at R4F000095)).  The parties accepted the revised proposal (GSUMF ¶ 8; app. resp. to
GSUMF ¶ 8) and executed bilateral Modification P00002 in December 2020 (GSUMF
¶ 9; app. resp. to GSUMF ¶ 9; R4, tabs 26A-B).

Modification P00002 awarded $409,322.04 and 34 additional days—reflecting the
total proposal amount of $909,332.04 and 64 days, offset by the $500,000 and 30 days
previously granted in Modification P00001 (GSUMF ¶ 9; app. resp. to GSUMF ¶ 9;
R4, tab 26A at R4F000421).  The scope of work in Modification P00002's provided:

> **RFI 0005 Erosion of South Side of [Placement Area 10]**
> Deletion of exterior shoreline berm and changes made to
> erosion protection design.  Thirty-four (34) calendar days is
> hereby added to contract to account for additional work
> needed for site preparation as a result of the alignment shift.

(GSUMF ¶ 9; app. resp. to GSUMF ¶ 9; R4, tab 26A at R4F000421)

Relevant to the dispute here, Modification P00002 also included the following
"closing statement," which the Corps contends constitutes a release:

> It is understood and agreed that pursuant to the above,
> the contract time is extended the number of calendar days
> stated, and the contract price is increased as indicated above,
> which reflects all credits due the Government and all debits
> due the Contractor.  It is further understood and agreed that
> this adjustment constitutes compensation in full on behalf of
> the Contractor and its Subcontractors and Suppliers for all
> costs and markups directly or indirectly attributable for the
> change ordered, for all delays related thereto, for all extended

4

overhead costs, and for performance of the change within the time frame stated.

(GSUMF ¶ 10; app. resp. to GSUMF ¶ 10; R4, tab 26A at R4F000421)

*Continued Erosion of South Side Shoreline*

Approximately five months later, in May 2021, Pontchartrain submitted RFI 0016, informing the Corps that the south side shoreline embankment was changing daily due to persistent wind conditions (GSUMF ¶ 11; app. resp. to GSUMF ¶ 11; R4, tab 12). The RFI stated:

> The southside shoreline embankment is changing daily due to south wind conditions causing more erosion than anticipated at the time of the [modification] issue. The south wind is causing the southside embankment to erode out at a rapid pace. [Pontchartrain] would like to field fit the slopes along the southside shoreline from elevation +15' to elevation -2' to avoid any further erosion. The constant wind/wave conditions are not allowing [Pontchartrain] to advance with shoreline embankment while meeting these slopes due to the material washout caused by these conditions.

(GSUMF ¶ 11; app. resp. to GSUMF ¶ 11; R4, tab 12 at R4F000337)  Pontchartrain also separately notified the Corps that post-modification site changes had rendered the revised design unworkable (ASUMF ¶ 9 (citing R4, tab 2I at R4F000223-25)).

The Corps agreed with Pontchartrain's recommendation to field fit the shoreline slope but stated that the change "would be at no additional cost or time" (gov't mot. at 10 (citing R4, tab 12 at R4F000337)).  Pontchartrain asserts that it never proposed nor agreed to a no-cost, no-time change (app. resp. to GSUMF ¶ 11).  It also notes that the Corps later omitted the "no additional cost or time" language in subsequent correspondence (*id.* (citing R4, tab 2J at R4F000245; Cook aff. ¶ 12)).  The record contains no modification showing that the parties reached agreement on this issue.

*Additional Contract Issues and Modification A00003*

Over several months in 2021, Pontchartrain and the Corps attempted to negotiate a bilateral modification to address issues unrelated to those addressed in Modifications P00001 and P00002—namely, the realignment of the effluent pipe and the installation of the rip rap splash pad (GSUMF ¶ 12; app. resp. to GSUMF ¶ 12).  When negotiations failed, the Corps issued Modification A00003 unilaterally to address those items (*id.*; R4, tab 7).  In December 2021, the contract was deemed substantially complete (GSUMF

¶ 13; app. resp. to GSUMF ¶ 13; R4, tab 3).  Following Modification A00003, the total adjusted contract price was $11,046,369.04 and the period of performance, including the time extensions in Modifications P00001 and P00002, was 579 days (gov't mot. at 12 (citing R4, tabs 7 at R4F000306; 00 at R4F00002)).

*Claim and Appeal*

In December 2022, Pontchartrain submitted a certified claim asserting entitlement to:

(i) $3,560,723.65 and 183 days for "work associated with Modification P00001;"
(ii) $447,522.64 and 23 days for "work associated with Modification P00002;"
(iii) $104,519.43 related to a quantity underrun for CLIN 0006; and
(iv) 34 days for work associated with Modification A00003.

(GSUMF ¶ 14; app. resp. to GSUMF ¶ 14; R4, tab 2A at R4F000023)

With respect to the shoreline erosion claims, Pontchartrain alleges that, after the issuance of Modifications P00001 and P00002, it continued to incur costs and expend additional resources due to design flaws, changing site conditions, and unreasonable government delays and interference—all of which allegedly caused Pontchartrain's work plan to change and pushed performance into unfavorable weather and conditions (R4, tab 2A at R4F000023, 27; app. opp'n at 12-13).  Pontchartrain further contends that the parties eventually had to abandon the design changes agreed to in Modifications P00001 and P00002 (R4, tab 2A at R4F000027).

The contracting officer denied in full Pontchartrain's claims related to Modifications P00001 and P00002 and granted in part the remaining claims (GSUMF ¶ 14; app. resp. to GSUMF ¶ 14; R4, tab 00).  Pontchartrain timely appealed the decision to the Board.[3]  The Corps now moves for partial summary judgment, arguing that the claims related to Modifications P00001 and P00002 are barred by release or accord and satisfaction (gov't mot. at 6).  The Corps alternatively contends that partial summary judgment is warranted on Pontchartrain's differing site conditions and commercial impracticability claims (gov't mot. at 10-15).  Pontchartrain opposes the Corps' motion (app. opp'n at 13-26).

---

[3] Due to the contracting officer's partial grant of the claim, Pontchartrain's complaint reflects a modified request related to the alleged quantity underrun for CLIN 0006 and the work associated with Modification A00003 (GSUMF ¶ 14; app. resp. to GSUMF ¶ 14; compl. ¶¶ 28, 31).

DECISION

I. Standard of Review for Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). The applicable substantive law determines which facts are material and may affect the outcome of the appeal. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party meets its initial burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted). At this stage, the Board's role is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Sonabend Co.*, ASBCA No. 63359, 24-1 BCA ¶ 38,482 at 187,033 (quoting *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393). A dispute is genuine if, based on the entirety of the record, a reasonable factfinder could resolve a factual matter in favor of the nonmovant. *Anderson*, 477 U.S. at 248. All evidence must be viewed in the light most favorable to the nonmoving party. *Crown Operations*, 289 F.3d at 1375.

In its motion, the Corps seeks summary judgment on its affirmative defenses of release and accord and satisfaction (gov't mot. at 6). The government bears the burden of proof on both defenses. *Sonabend Co.*, 24-1 BCA ¶ 38,482 at 187,033. When the movant bears the ultimate burden of proof, "the movant must make a stronger claim to summary judgment by introducing supporting evidence that would conclusively establish movant's right to a judgment after trial should nonmovant fail to rebut the evidence." *Id.* (citing *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1337 (Fed. Cir. 2010) (quoting 11 James Wm. Moore, Moore's Federal Practice § 56.13[1] (3d ed. 2009))).

We address the Corps' motion in three parts. First, we consider whether Pontchartrain's claims are barred by the release language in Modification P00002. Second, we examine the Corps' affirmative defense of accord and satisfaction. Finally, we address the Corps' alternative arguments for summary judgment related to alleged differing site conditions and commercial impracticability.

II. There is a genuine issue of material fact as to the scope of the release.

The Corps contends that the closing statement in Modification P00002 constitutes an unambiguous release that bars Pontchartrain's claims related to both Modifications P00001 and P00002 (gov't mot. at 9). Pontchartrain disagrees, arguing that the closing

7

statement does not constitute a release and, even if it does, that it applies only to the scope of work described in Modification P00002 (app. opp'n at 15-16).

"A release is a contract where a party abandons a claim or relinquishes a right that could be asserted against another." *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010) (quoting *Koules v. Euro-Am. Arbitrage, Inc.*, 689 N.E.2d 411, 414 (Ill. App. Ct. 1998)). Being contractual in nature, a release "must be interpreted in the same manner as any other contract term or provision." *Sauer Constr., LLC*, ASBCA No. 63738, 25-2 BCA ¶ 38,744 at 188,345; *Korte-Fusco JV*, ASBCA No. 59767, 15-1 BCA ¶ 36,158 at 176,455 (citing *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009)).

We begin with the plain language of the modification. *Clean by Lucy, Inc.*, ASBCA No. 58432 *et al.*, 16-1 BCA ¶ 36,287 at 176,969 (citing *Bell BCI Co.*, 570 F.3d at 1341); *Am. Int'l Contractors, Inc.*, ASBCA Nos. 60948, 61166, 18-1 BCA ¶ 37,061 at 180,411 (citing *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006)). Where the language of a modification is clear and unambiguous, it must be given its plain and ordinary meaning. *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993). We may not resort to extrinsic evidence to manufacture an ambiguity where none exists. *Am. Int'l Contractors Inc.*, 18-1 BCA ¶ 37,061 at 180,411 (citing *Interwest Constr. v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994)); *Korte-Fusco JV*, 15-1 BCA ¶ 36,158 at 176,455 (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). If the language is ambiguous, requiring the weighing of extrinsic evidence to determine intent, summary judgment is generally inappropriate. *Korte-Fusco JV*, 15-1 BCA ¶ 36,158 at 176,455 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988)).

A.     Modification P00002's closing statement constitutes a release.

We conclude that the language in the closing statement of Modification P00002 constitutes a release. Although both parties assert the plain language of the modification is unambiguous, they disagree on its meaning (gov't mot. at 9; app. opp'n at 16-17). The Corps contends that the modification includes a standard release clause, stating that the agreed-upon price and time adjustments constitute "compensation in full" for all costs, markups, delays, and extended overhead related to the changes (gov't mot. at 8-9). The Corps further argues that, although the word "release" does not appear, the language nevertheless reflects a clear and explicit intent to release claims related to the changes ordered. It further emphasizes that the language resulted from negotiations and a bilateral agreement, supporting the conclusion that Pontchartrain knowingly and intentionally accepted the terms as full and final resolution of the issue.

Pontchartrain, by contrast, argues that the closing statement contains no release language at all (app. opp'n at 13-14, 16-17; ASUMF ¶ 2). In an effort to distinguish the

8

language in Modification P00002, Pontchartrain relies on three decisions in which the Board or court found clear and explicit releases—each of which used the word "release" (app. opp'n at 16-17 (citing *Merrick Constr., LLC*, ASBCA No. 60906, 18-1 BCA ¶ 37,012; *Clean by Lucy, Inc.*, 16-1 BCA ¶ 36,287; *Safeco Credit v. United States*, 44 Fed. Cl. 406 (1999))).[4] While those cases involved unambiguous release language, they do not stand for the proposition that only such language can constitute a valid release.

The absence of the word "release" is not dispositive. The Board has repeatedly found that other formulations—identical or nearly identical to the language at issue here—may also operate as valid and enforceable releases. *Sauer Construction, LLC*, 25-2 BCA ¶ 38,744 at 188,345; *CKY, Inc.*, ASBCA No. 60451, 20-1 BCA ¶ 37,575 at 182,456; *Korte-Fusco JV*, 15-1 BCA ¶ 36,158 at 176,454; *see also Meridian Eng'g Co. v. United States*, 144 Fed. Cl. 667, 672 (2019); *John Massman Contracting Co. v. United States*, 23 Cl. Ct. 24, 29 (1991); *King Fisher Marine Serv. v. United States*, 16 Cl. Ct. 231, 234 (1989). Moreover, as we have observed, "[i]n the realm of Government contracts, absent mistake or duress not present here, few things signify knowing and intentional conduct more than does the execution of a bilateral modification." *Alutiiq Com. Enters., LLC*, ASBCA No. 61503, 20-1 BCA ¶ 37,506 at 182,198 (quoting *USD Techs., Inc.*, ASBCA No. 31305, 87-2 BCA ¶ 19,680 at 99,620, *aff'd*, 845 F.2d 1033 (Fed. Cir. 1988) (table)).

Accordingly, based on the plain language of the modification and the fact that Pontchartrain executed the agreement after negotiation and without reserving any claims for additional compensation, we conclude that the closing statement in Modification P00002 constitutes a release. Pontchartrain's argument that the parties did not intend the modification to provide "compensation in full" is unpersuasive in light of the plain language.

B.     The plain language of the release does not bar claims associated with Modification P00001.

Having concluded that the closing statement in Modification P00002 constitutes a release, we turn to its scope. Here again, the parties differ in their interpretation of the plain language of the modification. The Corps contends that the release unambiguously reflects the parties' intent to resolve all costs and delays associated with the erosion

---

[4] Pontchartrain asserts that it selected these three decisions because the Corps relied upon them to support the Corps' position (app. opp'n at 16). We do not read the Corps to be asserting that the release language in Modification P00002 is analogous to that in these prior cases; rather, the Corps appears to cite these decisions solely as part of its general discussion of the governing law on releases (*see* gov't mot. at 7).

issues identified in RFI 0005, including those addressed in the earlier Modification P00001 (gov't mot. at 8-9, 14-15). Pontchartrain argues that the release applies solely to the specific work described in Modification P00002, not to any work performed under Modification P00001 or to claims arising after the execution of Modification P00002 (app. opp'n at 14-15).

We conclude that the plain language of Modification P00002 does not encompass claims associated with the changes ordered under Modification P00001. As in *Sauer*, *CKY*, *Korte-Fusco*, and *Meridian*, the closing statement here limits the release to the specific "change ordered" in the modifications. The release states, in pertinent part:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly *attributable for the change ordered*, for all days related thereto, and for all extended overhead costs, and for performance of the change within the time frame stated.

(R4, tab 26A at R4F000421) (emphasis added) In *Sauer*, *CKY*, *Korte-Fusco*, and *Meridian*, the Board found nearly identical language to be limited in scope, applying only to the specific change ordered in the modification. *Sauer Construction, LLC*, 25-2 BCA ¶ 38,744 at 188,345; *CKY, Inc.*, 20-1 BCA ¶ 37,575 at 182,456; *Korte-Fusco JV*, 15-1 BCA ¶ 36,158 at 176,455; *Meridian Eng'g Co.*, 144 Fed. Cl. at 672. Here, Modification P00002 contains a section entitled "Scope of Work," which identifies the change as the "deletion of exterior shoreline berm and changes made to erosion protection design"—that is, work on the shoreline side of the containment dike (R4, tab 26A at R4F000421).

The Corps nonetheless urges us to apply this language to claims arising under Modification P00001. We find that argument unpersuasive. The text of Modification P00002 contains no reference to Modification P00001, its scope of work, or any associated claims. Although both modifications seek to address the erosion problem raised in RFI 0005, they address distinct aspects of the problem: Modification P00001 relates to work on the inland side of the containment dike, while Modification P00002 pertains to the shoreline side. Notably, a reader with no prior knowledge of Modification P00001 would find no indication in the text of Modification P00002 that such a modification existed. It is, therefore, difficult—indeed, unreasonable—to apply the release language from Modification P00002 to an entirely separate and unreferenced

matter.[5]  A release cannot apply to work it does not mention, describe, or even acknowledge.  Silence, in this context, is not a substitute for intent.

The Corps argues that because both modifications reference RFI 0005, the release in Modification P00002 should extend to the work under Modification P00001 (gov't mot. at 8-9 (citing R4, tabs 26A, 31); gov't reply at 3-4).  We reject this argument as too attenuated.  The mere fact that two modifications reference the same initial correspondence does not support the sweeping conclusion that the parties intended to release all claims associated with the general erosion issue.  Large construction projects routinely involve multiple phases and distinct scopes of work.  A shared reference to a broader problem does not override the clear, limited language of Modification P00002, which confines its application to the specific changes ordered therein.

In short, nothing in the plain and unambiguous language of Modification P00002 reflects an intent to release claims arising from the separate work ordered in Modification P00001.  Accordingly, we reject the Corps' invitation to consider extrinsic evidence to manufacture ambiguity where none exists in the text (gov't mot. at 9 n.1 (citing R4, tab 00 at R4F00004); *id.* at 8-9 (citing R4, tabs 29A, 38); GSUMF ¶ 7 (citing R4, tab 29A at R4F000461); gov't reply at 4-5 (citing R4, tabs 00, 2B, 29A, 37A)).

C. <u>There is a genuine issue of material fact as to whether the release bars the entirety of Pontchartrain's claim associated with Modification P00002.</u>

As discussed above, we conclude that the closing statement in Modification P00002 releases Pontchartrain's claim related to the specific change ordered therein.  The parties appear to agree on this general point (gov't mot. at 9; app. opp'n at 15 (stating that "the purported 'release language' cited by the government relates solely to the Modification P00002's scope of work")).  The Corps, however, argues that the release bars the entirety of Pontchartrain's claim for $447,522.64 and 23 days, which Pontchartrain describes as "associated with Modification P00002" (gov't mot. at 14-15; gov't reply at 1).  Pontchartrain contends that its claim is based largely on changes to the site that occurred after execution of the modification and thus falls outside the release (app. opp'n at 18-19).  We agree with appellant.  The substance of its claim extends beyond the scope of work ordered in Modification P00002.  In this respect,

---

[5] The Corps' reliance on our decisions in *Santa Fe Engineers* and *Chantilly Construction* is unavailing because, although both cases involved a phased modification approach to adding work, the second modification in each expressly referenced the first—providing a clear connection between the two.  *Santa Fe Eng'rs, Inc.*, ASBCA No. 31847, 90-1 BCA ¶ 22,274 at 111,890; *Chantilly Constr. Corp.*, ASBCA No. 24138, 81-1 BCA ¶ 14,863 at 73,391.  No such reference appears in Modification P00002.

Pontchartrain's own description of the claim as one "related to work associated with Modification P00002" is something of a misnomer (R4, tab 2A at R4F000023).

The claim includes allegations that, following execution of the modification, Pontchartrain was required to perform additional work due to unforeseen erosion, flawed designs, changing site conditions, and unreasonable government delays and interference (R4, tab 2A at R4F000023, 34-37). According to the claim and supporting correspondence—including RFI 0016 and subsequent communications—Pontchartrain asserts that the design reflected in Modification P00002 proved unworkable and was ultimately abandoned in favor of a revised field-fitted approach to address evolving site conditions (*id.* at R4F000027, 36; GSUMF ¶ 11; app. resp. to GSUMF ¶ 11; ASUMF ¶ 10; R4, tab 12; tab 2I at R4F000223; tab 2J at R4F000245).

Nothing in the plain language of Modification P00002 references this alleged additional erosion work. It would be illogical to assume that a contractor would knowingly agree to a design change while simultaneously waiving its right to claim that the very same design was defective. At best, the government could argue that the release is ambiguous as to whether it bars the additional erosion work. *See Sauer Constr.*, *LLC,* 25-2 BCA ¶ 38,744 at 188,345 (citing *CKY, Inc.*, 20-1 BCA ¶ 37,575 at 182,452, 182,455-56; *Korte-Fusco JV*, 15-1 BCA ¶ 36,158 at 176,455). The Corps, however, has not advanced this ambiguity argument.

Because the release is, at best for the government, ambiguous with respect to the additional erosion work, we may turn to extrinsic evidence to assess the parties' intent. *Sauer Constr., LLC*, 25-2 BCA ¶ 38,744 at 188,345 (citing *Beta Sys.,* 838 F.2d at 1183; *Korte-Fusco*, 15-1 BCA ¶ 36,158 at 176,455). Pontchartrain has submitted an affidavit from its Chief Construction Officer stating that, at the time the modifications were executed, neither party anticipated that the site would change to such an extent that the plans, drawings, and designs in the modifications would become unusable, requiring a revised field fit design (Cook aff. ¶ 7; *see also id.* ¶¶ 8, 11-12 (citing R4, tabs 2I, 2J) (describing the additional, unanticipated work)).[6]

---

[6] Pontchartrain also directs our attention to correspondence between the parties that Pontchartrain contends shows Corps agreement that additional compensation was due to Pontchartrain for work occurring after the modifications (ASUMF ¶ 10 (citing R4, tab 2J at R4F000245); app. opp'n at 20-21). The Corps disputes this characterization (gov't reply at 7-11). The import of this correspondence will have to await a factual determination after a hearing. For purposes of deciding the government's motion, however, it is sufficient to conclude, as we do, that Pontchartrain has presented sufficient evidence upon which a reasonable fact-finder, drawing all reasonable inferences in favor of Pontchartrain, could decide that the Corps conceded that the additional work merited additional compensation and time.

12

The Board has long recognized that absent unambiguous language to the contrary—which is lacking here—it is reasonable to infer that the parties did not intend to release claims wholly unknown to the parties at the time that they executed a release. *See Sauer Construction, LLC*, 25-2 BCA ¶ 38,744 at 188,345-46 (citing cases). A contractor must be aware of the specific facts supporting a claim—not merely have a general awareness that problems exist—for a release to bar that claim. *See id.*; *Martin Edwards & Assoc.*, ASBCA No. 57718, 12-2 BCA ¶ 35,058 at 172,210 (citing *Alliance Oil & Refining Co. v. United States*, 13 Cl. Ct. 496, 502 (1987), *aff'd*, 856 F.2d 201 (Fed. Cir. 1988)).

In sum, while we conclude that the release in Modification P00002 bars claims arising from the specific changes ordered in that modification, we cannot determine on the present record the extent to which Pontchartrain's broader claim related to erosion may nonetheless survive. There is a genuine issue of material fact as to whether the parties intended the release to cover the additional erosion work, which is not mentioned in the modification. Pontchartrain has presented sufficient evidence to suggest that the parties did not intend to release such yet-to-be-developed claims. Further development of the record is necessary to determine the extent of Pontchartrain's knowledge of the conditions described in the claim at the time it signed Modification P00002 and whether they fall within the scope of the release.

III.   The Corps has not met its burden on its accord and satisfaction defense.

The Corps also argues that it is entitled to summary judgment upon its affirmative defense of accord and satisfaction (gov't mot. at 9-10). An accord and satisfaction occurs "when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." *Sonabend Co.*, 24-1 BCA ¶ 38,482 at 187,035 (citing *Bell BCI Co.*, 570 F.3d at 1340-41). To prevail on this defense, "the government must show '(1) proper subject; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration.'" *Id.* (quoting *Bell BCI*, 570 F.3d at 1341).

For the same reasons discussed above with respect to the Corps' release defense, we cannot conclude that the Corps has met its burden to establish accord and satisfaction. At a minimum, a genuine dispute of material fact exists as to whether the parties intended Modification P00002 to preclude Pontchartrain's present claim related to additional erosion work and, thus, whether the "meeting of the minds" element is satisfied here. *See Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1364 n.12 (Fed. Cir. 2018) (citing *King Fisher Marine Serv.*, 16 Cl. Ct. at 236-37, for the proposition that the subject matter of the contract modification relied upon as an accord and satisfaction must be the same as the disputed claim); *WECC Inc.*, ASBCA No. 60949, 21-1 BCA ¶ 37,948 at 184,307.

Finally, before turning from the Corps' affirmative defenses to its alternative arguments for summary judgment, we address one remaining matter. The Corps asserts—buried in a three-sentence footnote—that it is entitled to summary judgment on its affirmative defense of payment (gov't mot. at 10 n.2). Footnotes are not a proper hiding place for key legal theories. If a point is worth making, it is worth making in the text—not whispered in a footnote. As the United States Court of Appeals for the Federal Circuit has stated, "Arguments raised only in footnotes . . . are waived." *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)). The Board may (or may not) exercise its discretion to consider improperly raised arguments. *Lockheed Martin Aeronautics Co.*, ASBCA No. 62209, 22-1 BCA ¶ 38,178 at 185,414 n.14.

We have considered the Corps' request, and we deny it. Although the Corps acknowledges that it bears the burden of proof, it offers no factual support whatsoever for this defense. Its argument is limited to a conclusory statement that it is entitled to summary judgment "[t]o the extent there is no material dispute as to whether [Pontchartrain] has received payment" (*id.*). Unsupported assertions, particularly where the moving party bears the burden, are insufficient to warrant summary judgment. *See GLJ, Inc.*, ASBCA No. 62964, 22-1 BCA ¶ 38,121 at 185,184 (citing *Mingus Constructors, Inc.*, 812 F.2d at 1390; Board Rule 7(c)).

IV.     Disposition of the Corps' Alternative Grounds for Partial Summary Judgment

The Corps argues that, to the extent Pontchartrain's claims are not barred by affirmative defenses, summary judgment is appropriate with respect to Pontchartrain's allegations of differing site conditions and commercial impracticability (gov't mot. at 14-15). For the reasons explained below, we deny the Corps' motion with respect to the differing site condition claim, but grant summary judgment in favor of the Corps on Pontchartrain's theory of commercial impracticability.

A.      Genuine issues of material fact preclude summary judgment on the differing site condition claim.

With respect to the differing site condition claim, the Corps contends that Pontchartrain should have anticipated the conditions it encountered, pointing to contract specifications warning of saturated soil conditions (*id.* at 13-14; gov't reply at 12-13). We deny the Corps' motion on this ground. Pontchartrain has presented sufficient evidence to suggest that the site conditions were not foreseeable at the time of bidding or performance (app. opp'n at 23-24; Cook aff. ¶¶ 9-10). As such, there is a genuine issue of material fact that precludes summary judgment and further development of the record is necessary to resolve this matter. *AXXON Int'l, LLC*, ASBCA No. 61224 *et al.*, 20-1 BCA ¶ 37,489 at 182,145.

14

B.    Pontchartrain's cost overrun, standing alone, does not establish commercial impracticability.

The Corps also seeks summary judgment on Pontchartrain's allegation of commercial impracticability (gov't mot. at 10-13; gov't reply at 11-12).  In both the claim and complaint, Pontchartrain alleges that the work associated with the modifications became commercially impracticable (R4, tab 2A at R4F000031, 37; compl. ¶¶ 23-24).  We grant summary judgment for the Corps on this issue.

As the Federal Circuit explained in *Raytheon Co. v. White*, 305 F.3d 1354 (Fed. Cir. 2002), a contract is commercially impracticable when performance would cause "'extreme and unreasonable difficulty, expense, injury, or loss to one of the parties.'"  *Id.* at 1367 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. d (1981)).  In government contracting, impracticability is treated as a constructive change.  *Id.*; *Safety Training Sys., Inc.*, ASBCA No. 57095, 14-1 BCA ¶ 35,509 at 174,051.  Because such conditions impose substantial unforeseen costs on the contractor, an equitable adjustment may be warranted.  *Raytheon Co.*, 305 F.3d at 1367.

To establish commercial impracticability, the contractor must show that, due to unforeseen events, the contract "'can be performed only at an excessive and unreasonable cost,'" *id.* (quoting *Int'l Elecs. Corp. v. United States*, 646 F.2d 496, 510 (Ct. Cl. 1981)), or that "'all means of performance are commercially senseless.'"  *Id.* (quoting *Jennie–O Foods, Inc. v. United States*, 580 F.2d 400, 409 (Ct. Cl. 1978)).  Whether performance reaches this high bar is a question of fact.  *Safety Training Sys., Inc.,* 14-1 BCA ¶ 35,509 at 174,051 (citing *Raytheon Co.,* 305 F.3d at 1367).  Notably, in *Raytheon*, the Federal Circuit held that a 57 percent cost overrun percent did not establish commercial impracticability.  *Raytheon Co.*, 305 F.3d at 1368.

Here, Pontchartrain alleges a 328 percent cost overrun and a 600 percent increase in time (app. opp'n at 23), while the Corps asserts that the actual increase is no more than 37 percent in cost and 41 in time (gov't mot. at 12; gov't reply at 11-12).  The discrepancy stems from different methodologies:  Pontchartrain compares the amount it allegedly spent to perform the modifications to its original estimate for the modification work (app. opp'n at 23), whereas the Corps compares the total alleged cost of contract performance to the total adjusted contract price (gov't mot. at 12; gov't reply at 11).  In short, Pontchartrain compares a subset of actual costs to its initial estimate for the work, while the Corps compares total actual costs to total adjusted contract price.  We determine that the Corps' methodology is the correct way to evaluate commercial impracticability.

The Federal Circuit directly addressed this issue in *Raytheon*.  There, Raytheon alleged that performance became commercially impracticable due to unforeseen labor costs stemming from government delays and deficiencies in the government-furnished

15

technical data package.  The Board, in its merits decision, rejected Raytheon's argument, finding that although the 57 percent cost overrun was "substantial," it did "not by itself constitute commercial impracticability."  *Raytheon Co.*, ASBCA Nos. 50166, 50987, 01-1 BCA ¶ 31,245 at 154,204, *aff'd*, 305 F.3d 1354.

On appeal, Raytheon argued—like Pontchartrain—that the Board erred by comparing the estimated cost of completion to the adjusted contract price, rather than the original contract price.  *Raytheon Co.*, 305 F.3d at 1367.  The Federal Circuit rejected this position:

> Raytheon cites no legal authority to support its position, and we do not find its argument persuasive.  When calculating an overrun for purposes of determining commercial impracticability, it is reasonable to compare the estimated cost of completion with the contract price at the time of termination.  In a hypothetical situation in which all [contract issues] are resolved promptly and the contract price is adjusted accordingly, the contract would not be commercially impracticable, because the adjusted contract price would accurately reflect the cost of performing the entire contract as adjusted, rather than as awarded.

*Id.* at 1367-68.  In other words, the proper comparison is between the estimated cost of completion and the total adjusted contract price at the time of termination, not the original contract price at the time of award.

We adopted the same conclusion in *Safety Training Systems, Inc.*, 14-1 BCA ¶ 35,509.  The contract in *Safety Training Systems* involved the supply, modification, delivery, and installation of an Airbus A300 aircraft trainer at a training center in Jordan. Safety Training Systems alleged that it incurred unforeseeable and excessive transportation costs—far beyond its original estimate—due to rising oil prices and shipping delays, and sought an equitable adjustment for those costs.  Safety Training Systems argued that the dramatic increase in shipping costs—allegedly a 544 percent rise—rendered performance commercially impracticable.  We rejected the claim, concluding that Safety Training Systems' assertion of impracticability was "flawed because it compares only its original transportation estimate to the amount it eventually spent on transportation."  *Id.* at 174,052.  Instead, as we held, "[c]ommercial impracticability is more appropriately determined by comparing the total contract price to the cost of performance."  *Id.*

Here, it is undisputed that Pontchartrain's claim alleges a total cost overrun of $4,112,765.73 and 240-day delay, and that the total adjusted contract price following Modification A0003 was $11,046,369.04 with a 579-day period of performance (R4,

tab 2A at R4F000023; gov't mot. at 12 (citing R4, tab 7 at R4F000306; tab 00 at R4F00002); *see* app. opp'n at 22-23, 25). Because the commercial impracticability issue concerns only the method of calculation to determine the percentage of the cost overrun—not the underlying costs— there is no genuine issue as to any material fact.

Having calculated the overrun at 37 percent, the Corps directs our attention to multiple cases in which cost overruns greater than that claimed here were held insufficient to establish commercial impracticability (gov't reply at 12; *see also* gov't mot. at 11-12). *See Raytheon Co.*, 305 F.3d at 1368 (57 percent overrun); *Naughton Energy*, ASBCA No. 33044, 88-2 BCA ¶ 20,800 at 105,067, 105,073 (59 percent overrun); *Gulf & Western Indus., Inc.*, ASBCA No. 21090, 87-2 BCA ¶ 19,881 at 100,575 (70 percent overrun); *ACE Serv. Corp.*, ASBCA No. 32052, 86-3 BCA ¶ 19,031 at 96,127, 96,129 (75 percent overrun); *Short Bros., PLC v. United States*, 65 Fed. Cl. 695, 785 (2005) (40 percent overrun). *See also Commissioning Solutions Global, LLC*, ASBCA No. 57429, 13 BCA ¶ 35,355 at 173,532 (concluding that only a loss "substantially greater" than the alleged 30.4 percent might equate to commercial impracticability).

The Corps also directs our attention to Board cases relied upon by the Federal Circuit in *Raytheon* to demonstrate the high bar that must be met in these types of cases (gov't mot. at 11). *See Raytheon Co.*, 305 F.3d at 1368 (citing *Soletanche Rodio Nicholson (JV)*, ENG. BCA Nos. 5796, 5891, 94-1 BCA ¶ 26,472 at 131,774, 131,779 (finding commercial impracticability when compliance with the specification would have taken more than 17 years at a cost of more than $400 million rather than 720 days and $16.92 million); *Numax Elecs. Inc.*, ASBCA No. 29080, 90-1 BCA ¶ 22,280 at 111,916 (finding commercial impracticability when the contractor obtained a yield of only 300 acceptable units out of 8,000, or 3.75 percent success rate); *Whittaker Corp., Power Sources Div.*, ASBCA No. 14191 *et al.*, 79-1 BCA ¶ 13,805 at 67,688-89 (granting relief where what the parties thought would be a seven-month production contract turned into an unsuccessful four-year development effort with a 148 percent cost overrun). These cases show cost overruns or performance burdens of a significantly greater magnitude than those alleged by Pontchartrain.

Relying on this case law, the Corps contends that, "as a matter of law, this contract was not commercially impracticable" (gov't reply at 12). We emphasize, however, that commercial impracticability is ultimately a question of fact, not law. *Safety Training Sys., Inc.*, 14-1 BCA ¶ 35,509 at 174,051 (citing *Raytheon*, 305 F.3d at 1367). We, therefore, decline to adopt a bright-line rule that a 37 percent cost overrun can never, under any circumstances, constitute commercial impracticability. At the same time, the standard for establishing commercial impracticability is a rigorous one, in part because the doctrine is susceptible to abuse. *Jennie-O Foods, Inc. v. United States*, 580 F.2d 400, 409 (1978) ("The commercial impracticability standard can be easily abused; thus this court has not applied it with frequency or enthusiasm. It is not invoked

merely because costs have become more expensive than originally contemplated."); *Short Bros., PLC v. United States*, 65 Fed. Cl. at 784 (describing the Federal Circuit's standard as "rigorous"). In light of the Federal Circuit's high bar to establish commercial impracticability, a 37 percent overrun does not—on its face—suggest performance that was commercially senseless or exorbitant.

Although this is a fact-intensive inquiry, the parties have placed before us only a single data point: the percentage of the cost overrun. Pontchartrain offers no factual details or supporting evidence that might create a genuine issue of material fact on this claim (app. opp'n at 22–23). Nor does it cite any authority in which a similar magnitude of cost or time overrun was found to support a claim of commercial impracticability. Instead, Pontchartrain relies solely on its proposed methodology for calculating the percentage increase, arguing that its alleged 328 percent overrun "easily" meets the standard (app. opp'n at 23 (citing *Whittaker Corp., Power Sources Div.*, 79-1 BCA ¶ 13,805 at 67,6888-89); *id.* at 25 (alleging the cost overrun is "similar to matters in which courts have held constitute commercial impracticability")). In short, both parties ask us to resolve this issue based solely on the numbers presented. On this record— absent evidence of disputed material facts—summary judgment in favor of the Corps is appropriate on this issue.

## CONCLUSION

For the foregoing reasons, we grant summary judgment in favor of the Corps on Pontchartrain's commercial impracticability claim. We deny the remainder of the Corps' motion because there are genuine issues as to material facts that preclude summary judgment.

Dated: May 19, 2025

ELIZABETH WITWER
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur                                                  I concur


_____                        _____
OWEN C. WILSON                                  MICHAEL N. O'CONNELL
Administrative Judge                            Administrative Judge
Acting Chairman                                 Vice Chairman
Armed Services Board                            Armed Services Board
of Contract Appeals                             of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 63615, Appeal of
Pontchartrain Partners, LLC, rendered in conformance with the Board's Charter.

Dated: May 19, 2025


_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

19